## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

THE LL&E ROYALTY TRUST,
by ROGER D. PARSONS, TRUSTEE,

        Plaintiff,

v.

                                                 Case No.

QUANTUM RESOURCES
MANAGEMENT, LLC;
QR ENERGY, LP and QRE
OPERATING, LLC,

        Defendants.

---

## COMPLAINT FOR LEGAL AND INJUNCTIVE RELIEF
## AND APPOINTMENT OF RECEIVER

Plaintiff the LL&E Royalty Trust (the "Trust"), by Roger D. Parsons, Trustee, states as follows for its Complaint against Defendants Quantum Resources Management, LLC; QR Energy, LP and QRE Operating, LLC:

### Notice to Preserve Records and Documents

Defendants are hereby notified to preserve all records and documents in all forms and formats (digital, electronic, film, magnetic, optical, print, etc.) during the pendency of this action that are relevant or may lead to relevant information and to notify your employees, agents and contractors that they are required to take appropriate action to do so.

### Nature of the Case

1.      This is an action for money damages, injunctive relief and appointment of a receiver based on the Defendants' illegal and fraudulent actions, including (a) failing to pay the Trust royalties to which it is contractually entitled from certain oil producing property and (b) fraudulently manipulating oil production and production costs to drive down the value of the

00928127.DOCX

Trust's interest in the royalties in an attempt to purchase the Trust's interest at an artificially low price. Defendants have systematically and deliberately refused to pay required royalties to the Trust while at the same time denying the Trust access to financial information necessary to determine the extent of the harm Defendants' improper, self-serving actions have caused the Trust.

## Parties

2.      Plaintiff Trust is a Michigan trust with an address of 354 Indusco Court, Troy, Michigan 48083. The Trust is a citizen of Michigan, which is the situs of the Trust and the location of the Trustee.

3.      Defendant Quantum Resources Management, LLC ("QRM") is a Delaware limited liability company with its principal place of business located at 1401 McKinney Street, Suite 2400, Houston, Texas 77010. QRM is a citizen of Delaware and Texas. On information and belief, none of QRM's members is a citizen of Michigan.

4.      Defendant QR Energy, LP ("QR Energy") is a Delaware limited partnership with its principal place of business located at 1401 McKinney Street, Suite 2400, Houston, Texas 77010. QR Energy is a citizen of Delaware and Texas. On information and belief, none of QR Energy's partners is a citizen of Michigan.

5.      QR Energy was formed in September 2010 to acquire certain oil and gas assets, including the assets at issue in this case, from certain affiliated entities.

6.      Defendant QRE Operating, LLC ("QRE Operating") is a Delaware limited liability company with its principal place of business located at 1401 McKinney Street, Suite 2400, Houston, Texas 77010. QRE Operating is a citizen of Delaware and Texas. On information and belief, none of QRE Operating's members is a citizen of Michigan.

00928127.DOCX

7.     QR Energy conducts its operations through QRE Operating, which is a 100% owned subsidiary of QR Energy.

8.     QRM, QR Energy and QRE Operating are sometimes referred to collectively as "Quantum."

## Jurisdiction and Venue

9.     This Court has jurisdiction under 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000 exclusive of interest and costs.  The Court also has jurisdiction over this matter under 28 U.S.C. § 1331 because involves a federal question under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.  § 1961, et seq.

10.     This Court has personal jurisdiction over QRM, QR Energy and QRE Operating because (a) they took actions that resulted in consequences in Michigan that give rise to the Trust's tort claims asserted in this Complaint and (b) they transacted business in Michigan with a citizen of Michigan in connection with the transactions at issue by breaching their contractual obligations to the Trust.  Not only is Michigan the situs of the Trust and the location of the Trustee, but the owners of the majority of the Units (shares) of the Trust are also located in Michigan.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## Facts

12.     On June 1, 1983 the Louisiana Land and Exploration Company (the "LL&E Company"), a Maryland corporation, established the Trust.

13.     The Trust is a publicly traded trust that owns certain royalty rights in oil and gas producing properties in Florida and Alabama and in waters offshore of Louisiana.

3

00928127.DOCX

14.     The principal, productive properties in which the Trust holds a royalty interest are known as the Jay Field, South Pass 89 and Offshore Louisiana.  The Trust's royalty interests in the Jay Field and Defendants' improper actions relating to those interests are the focus of this action.

15.     The "Working Interest Owner" of an oil and gas field develops and manages the operations of the field, in exchange for a portion of royalties, while an "Operator" physically operates the field.

16.     As of December 2006, the Working Interest Owners of the Jay Field were ConocoPhillips and ExxonMobil.  The Operator was ExxonMobil.

17.     In December 2006, Quantum purchased the Working Interests of both ConocoPhillips and ExxonMobil in the Jay Field.  Quantum purchased the Operator interest in the Jay Field from ExxonMobil in April 2007.

18.     On information and belief, Quantum paid ConocoPhillips and ExxonMobil more than $200 million for practical control over the Jay Field through the acquisition of the Working Interests and the Operating Interest.

19.     Although it acquired control of the operations and profits of the Jay Field, Quantum made no effort in 2006 and 2007 to acquire the Trust's Overriding Royalty Interest in the Jay Field.  As described below, Quantum's only attempt to acquire the Trust's interest was through a rigged process with the goal of purchasing the interest for a fraction of its worth.  Otherwise, Quantum appears to have been content to withhold royalties and information from the Trust in an attempt to weaken the Trust's position and force an eventual sale.

20.     When Quantum purchased the working interest in the Jay Field, it took on the duties and obligations of the "Assignor," as that term is defined in the Conveyance  of

00928127.DOCX

Overriding Royalty Interests dated June 28, 1983 relating to the Jay Field, (the "Conveyance'").
(Ex. A.) The Trust is the successor "Assignee" as that term is used in the Conveyance.

21.     The Conveyance requires the Assignor (now Quantum) to make monthly
payments to the Trust attributable to the Trust's Overriding Royalty Interests. (*Id.*, p. 12.)
Quantum's refusal to make such payments is the crux of the Trust's claims asserted here.

**Quantum's Manipulation of the Special Cost Escrow Account to Avoid Paying the Trust**

22.     Where specific conditions are satisfied, subsection (e) of Article VIII of the
Conveyance permits Quantum to place into a "Special Cost Escrow Account" certain funds that
otherwise would be distributed to the Trust as "Overriding Royalty Interests" under Article
VIII(a) of the Conveyance. (*Id.*, pp. 14-15.)

23.     Article VIII(e) places a limit on the amount of funds that Quantum may place in
the Special Cost Escrow Account: "[a]t such time as the amount in the Special Cost Escrow
Account for the Property exceeds 125% of the aggregate estimated future Special Costs for the
Property, no further amount shall be placed in such escrow until such time as the
Escrowed Funds in the Special Cost Escrow Account shall again be less than 125% of said
aggregate estimated future Special Costs." (*Id.*, p. 14.)

24.     Section 1.22 of the Conveyance defines "Special Costs" as estimated closure costs
and estimated future capital expenditures for the Jay Field. (*Id.*, p. 11.)

25.     Put simply, the Conveyance requires Quantum to make Overriding Royalty
Interest payments to the Trust net of estimated future costs associated with the Jay Field.

26.     Prior to Quantum assuming the dual roles of Operator and Working Interest
Owner of the Jay Field, the Trust regularly received royalty payments for decades.

27.     Since Quantum took effective control of the Jay Field in April 2007, however, Quantum has taken numerous actions to avoid its obligations to make royalty payments to the Trust.  Those efforts, though dishonest, have been successful.  The last recurring Overriding Royalty Interest made to the Trust was prior to April 2007, when Quantum took over as Operator.  Quantum made a single royalty payment in September 2008.

28.     One tactic utilized by Quantum to avoid its payment obligations has been to greatly increase the size of the Special Cost Escrow Account to prevent the Trust from receiving its net payments.

29.     The balance of the Special Cost Escrow Account specific to the Jay Field was approximately $4.5 million from 2000 through 2010, a period when ConocoPhillips and ExxonMobil were in control of the field.

30.     As of September 30, 2010, the Special Cost Escrow Account had a balance of $4.3 million, but Quantum increased that balance to approximately $36 million as of June 2014, an increase of approximately 900%.

31.     Despite the clear and unambiguous language of Article VIII(a) of the Conveyance,  the last recurring Overriding Royalty Interest payment that Quantum made to the Trust was prior to April 2007, more than seven years ago.

32.     What is particularly troubling about the excessive amount of the Trust's royalty payments that Quantum has been placing in the Special Cost Escrow Account is not just the amount of funds the Trust has thus been denied, but also the fact that Quantum is obligated to place a corresponding amount of funds in the Escrow Account, but has instead, on information and belief, been booking those funds on its financial statement, but not contributing funds to the Escrow Account and taking payments for itself.

33.     Quantum is required to contribute to the Special Cost Escrow Account in an amount equal to the Trust's contribution because it holds an equal interest to the Trust in the Overriding Royalty Interest payments from the Jay Field.

34.     Because Quantum controls the Jay Field as the Operator and Working Interest Owner, and because Quantum thus can set the amount placed into the Special Cost Escrow Account, and because Quantum is booking its contribution to the Escrow Account as a reserve rather than actually contributing funds, Quantum can establish an artificially high escrow amount with no negative impact on Quantum, only on the Trust.

35.     Quantum's conduct with respect to Overriding Royalty Interest payments, including the passage of many years since Quantum last made a payment, demonstrates that Quantum never intends to make a royalty payment to the Trust under the Conveyance and instead will continue to revise the balance of the Special Cost Escrow Account in Quantum's unilateral and improper interests, and contrary to the interests of the Trust.  At a minimum, Quantum's conduct demonstrates that it manipulate the Special Cost Escrow Account to deny the Trust its rightful share of royalty payments.

**Quantum's Unilateral, Secretive Conduct Regarding Excess Production Costs**

36.     In a further attempt to justify its failure to make Overriding Royalty Interest payments to the Trust, Quantum has informed the Trust that Quantum is using the Trust's royalty payments to reimburse Quantum for certain costs associated with (a) maintaining the Jay Field during a shutdown in late 2008 through most of 2009 (a shutdown Quantum unilaterally caused) and (b) capital expenditures allegedly undertaken at the Jay Field in 2009, and funded by Quantum.  The total of those costs is the "Excess Production Cost" balance.

37.     Quantum's lack of transparency regarding the Excess Production Cost balance

7

supports the Trust's contention that it is yet another tactic by Quantum to deny the Trust its rightful share of royalties from the Jay Field.

38.     Similar to the Special Cost Escrow Account, whatever legitimate costs make up the Excess Production Cost balance should be borne equally by Quantum and the Trust because they hold equal interests in the Overriding Royalty Interest payments from the Jay Field, and must share equally in the costs.

39.     Quantum has not disclosed to the Trust the following information: (a) detail regarding the costs allegedly incurred in 2009, which created the original Excess Production Cost balance; (b) evidence of Quantum's payment of such costs; (c) why the balance has increased in certain time periods post-2009 when the costs at issue were purportedly incurred in 2009; or (d) detail regarding the post-2009 costs that have purportedly increased the balance.

40.     Quantum has made empty promises to the Trust that "[t]he Trust will begin receiving royalty payments once this Excess Production Cost balance is paid down," but nothing in Quantum's self-serving, unilateral actions that have caused the Trust's royalty payment to cease over the last approximately six years suggest that Quantum's promises are anything but empty.

41.     In fact, in almost 40% of the months from September 2010 through April 2014, the Excess Production Cost balance actually increased, which is odd given that Quantum has represented to the Trust that the costs at issue were incurred in 2008 and 2009.

42.     In April 2014 alone, the last period for which Quantum has provided the Trust with financials relating to the Jay Field, the Excess Production Cost balance increased by more than $1.6 million.

43.     Quantum will undoubtedly continue to manipulate the Excess Production Cost

8

balance to ensure that the Trust receives little to no royalty payments relating to its interest in the Jay Field.

44.     In a meeting with the prior Trustee, James Barlett, Quantum's management admitted that the Trust was "always 12-24 months away from being paid."  This admission is critical because it reveals Quantum's illegal strategy regarding the Trust's interests:  (1) refuse to pay royalties, (2) provide some information, but only when the Trust demands it and never complete information, (3) continually promise to begin paying royalties to placate the Trust and avoid legal action, and (4) eventually fleece the Trust of its interest once it is sufficiently weakened and frustrated.

**Quantum's Prior Attempt to Fraudulently Obtain the Trust's Assets**

45.     In the late 2000s, Quantum engaged in a variety of actions designed to manipulate the perceived value of the Trust's assets, including its interest in the Jay Field, with an obvious intent to obtain the Trust's assets at an artificially deflated price.

46.     On information and belief, Quantum manipulated the production of the Jay Field and withheld critical information so that a Trust provision mandating a sale of assets would be carried out, so that Quantum could purchase the assets at a price that Quantum was in a unique position to know was artificially low.

47.     The Trust Agreement in force prior to a May 31, 2013 amendment, stated at Sections 9.01(a), in relevant part:

> The Trust shall terminate upon the first to occur of the following events or times unless sooner terminated according to law:  (a) at such time as its net revenues reach of two successive years are less than $5,000,000 per year (calculated for purposes of this Section as if the Trust had received its pro rata portion of any amounts being withheld by the working interest owners or the partnership under escrow agreements or to make refund payments pursuant to the conveyance).

48.     The prior Section 9.02 stated that, upon termination of the Trust when net revenues fall below $5 million in successive years, the Trustee was required to sell all trust assets.  Any assets not sold within three (3) years were required to be sold at public auction.

49.     Although a Trust Unit holder (like a stockholder) was ultimately able to prevent the sale of the Trust's productive assets through litigation, a prior Trustee, Bank of New York Mellon, believed it was required to sell the Trust's assets because, according to the prior Trustee, net revenues to the Trust in 2006 and 2007 were $2,094,226 and $1,634,740, respectively.  In other words, net revenue was below $5 million in two successive years.

50.     Once the mandatory termination and liquidation provisions of the Trust were triggered by the fall in revenue, Trust Unit holders attempted to obtain information on the Trust's assets and revenue.  However, the former Trustee failed to make such information available to Unit holders or to publicly report in filings with the SEC certain critical information regarding the Trust assets and revenue.

51.     The former Trustee's stated reasons for failing to make its required public filings are (1) that it has failed to obtain information from Quantum regarding the Trust's assets and revenues and (2) that it is waiting for results from an independent consultant engaged to verify information previously supplied by Quantum to the Trustee.

52.     The Trustee's failure to report the Trust's financial information at the time, a failure caused by Quantum, prevented Unit holders and the public from accurately evaluating numerous issues, such as (1) whether the Trust net revenue in fact fell below $5 million in 2006 and 2007, (2) the value of the Units in the Trust and (3) the true value of the assets that the Trustee was proposing to sell.

00928127.DOCX

53.     There was one entity, however, that did have the most complete information regarding the true value of the Jay Field's resources – Quantum.

54.     Rather than provide information to the Trustee (and the Unit holders), Quantum seized upon the opportunity to devalue the Trust's interest by suspending production from the Jay Field in December 2008.  Quantum cited increased costs and a decline in oil prices as the reasons for the suspension, but the timing could not have been better for Quantum, or potentially worse for the Trust.

55.     As stated above, Quantum was and is both the Working Interest Owner and the Operator of the Jay Field.  In those dual roles, Quantum had both operational and oversight duties that gave rise to an inherent conflict of interest with respect to its obligation to provide accurate information to the Trust.

56.     Another obvious conflict of interest regarding Quantum – which potentially affected the perceived value of the Trust assets and the value of the Units – is that Quantum was (1) one of the parties with whom the Trustee was negotiating a potential sale of Trust assets and (2) a likely bidder at the proposed public auction of Trust assets.

57.     Indeed, Quantum at one time took the position that it held a "preferential purchase right" in the Trust's interest in the Jay Field, but Quantum ultimately abandoned that position.

58.     In December 2009, The Bank of New York Mellon Trust Company, N.A. ("BNY"), the former trustee of the Trust, began efforts to sell the Trust assets through a public auction.

59.     On information and belief, prospective bidders other than Quantum were discouraged or prevented from participating in the auction and bidding on the assets.  On information and belief, this may have been a result of coordinated efforts between QRM and the

prior trustee and represents further evidence of Quantum's plan to exert complete, unilateral control over the Trust assets to the detriment of the Trust.

60.     On information and belief, Quantum was attempting to purchase the Trust's interest in the Jay Field for approximately $2.5-3.0 million.

61.     Based on a May 27, 2008 Reserve Report prepared by Miller and Lents, Ltd. and other publicly available data, the value of the Trust's interest in the Jay Field was actually between approximately $63 million and $93 million in 2007/2008.  Those valuations were based on an oil price of $64-67 per barrel.  (*Id.*)

62.     At today's oil prices of approximately $95 per barrel, the current value of the Trust's interest in the Jay Field reserves is obviously substantially higher.

63.     Quantum's $2.5-3.0 million offer for assets that were worth more than $60 million at the time and are now worth far more evidences Quantum's bad faith from the outset in its dealings with Trust.

64.     On information and belief, Quantum was well aware of the termination and sale trigger in the Trust Agreement in the event net revenue fell below $5 million in consecutive years, and it manipulated and failed to disclose information in the hopes that obtain the Trust's interest in the Jay Field (and other assets) for pennies on the dollar.

65.     When its scheme was thwarted, Quantum engaged in similarly illegal and improper conduct by (a) manipulating the Special Cost Escrow balance and the Excess Production Cost balance in an effort to starve the Trust of revenue (b) refusing to provide monthly financials and refusing to fully disclose information requested by the Trust's auditors in an effort to starve the Trust of knowledge regarding its asset.

66.     As shown by the facts above, Quantum never intended to satisfy its contractual and fiduciary obligations to the Trust under the Conveyance.  From the time it purchased the Working Interest and Operating Interest in last 2006/early 2007, Quantum has engaged  in a pattern of conduct aimed not only at preventing the Trust from receiving revenue to which is entitled, but also to obtain the Trust's asset at a bargain basement price through its fraudulent actions.

**Quantum's Failure to Provide Information to the Trust**

67.     Since attempting to fleece the Trust of its assets in the late 2000s, Quantum also has continued its pattern failing and refusing to provide information to the Trust, thus hampering the Trust's ability to understand what revenue it should be receiving.

68.     Under Article XVII(b) of the Conveyance (Ex. A, p. 20):

Assignor  shall  provide  the  nationally recognized  firm of independent  public accountants selected by Assignee, which firm shall not be unacceptable to Assignor in the exercise of reasonable business judgment (the "Independent Accountants"), with access, at the office of Assignor during normal business hours to Assignor's books and records, which books and records shall be true and correct in all material aspects and sufficient  to enable  the Independent Accountants  to verify the correctness  of the amounts  paid and payable to Assignee as the owner of the Overriding Royalty Interests.

69.     Despite the clear language of the Conveyance requiring Quantum to provide access to the Trust's auditors, Quantum has refused to provide the auditors, BRI Consulting Group of Houston, with information repeatedly requested to assist with its audit in late 2013.

70.     Quantum also does not provide the Trustee with timely monthly financial reports, as it is required to do.  To obtain financial information, the Trustee is consistently forced to demand reports from Quantum and wait for Quantum to provide them at its whim, if all.  In fact, the Trust last requested financial reports at a meeting with Quantum in Chicago in July 2014.

13

00928127.DOCX

Despite Quantum's assurance that reports would be provide "timely," not a single report has been provided in the more than two months since that meeting.

71.     Quantum also has failed and refused to provide historical financial information relating to the Jay Field, particularly for the time period 1983 to 2007.  The Trust understands that Quantum did not purchase its interests in the Jay Field until late 2006 and early 2007, but it strains credulity to believe that it took control of the Jay Field without obtaining historical financial information from ExxonMobil and ConocoPhillips.

72.     On information and belief, Quantum has refused to provide historical financial information because the information would show the drastic changes Quantum has made to the operations and finances of the Jay Field, to the detriment of the Trust and for the betterment of Quantum.

73.     Quantum has consistently failed and refused to provide the Trust's auditors with all information requested by the auditors.

74.     Quantum's refusal to provide complete information, particularly when viewed in the context of its prior attempt to obtain the Trust's assets at a fraction of their value and Quantum's consistent refusal to pay the Trust its royalty payments, can only be viewed as an intentional effort to mask Quantum's improper and fraudulent actions.

75.     Quantum's refusal to (a) provide complete financial information relating to the Jay Field and (b) refusal to make required royalty payments to the Trust also has prevented the Trust from meeting its obligation to file required annual and quarterly with the United States Securities and Exchange Commission.  Quantum's actions have denied the Trust both the information and the funds necessary to prepare and file appropriate and accurate statements with

14

the SEC. As a direct result of Quantum's actions, the SEC has initiated the process of revoking the Trust's registration for failing to meet filing requirements.

**The Pending Acquisition of Quantum**

76.     Quantum recently announced that BreitBurn Energy Partners, L.P. ("BreitBurn") is in the process of acquiring QR Energy (and thus also QRE Operating).

77.     On information and belief, Quantum has placed a certain value on its assets related to the Jay Field as part of the transaction with BreitBurn. The Trust has a right to know that value because it may shed light on the true value of the Trust's interest in the Jay Field.

78.     On information and belief, the Trust's ability to obtain historical and current financial information relating to the operations of the Jay Field and the Trust's royalty interest will be further hampered by the sale of Quantum's interest in the Jay Field to BreitBurn.

79.     On information and belief, BreitBurn expects to close on its acquisition of Quantum by late 2014 or early 2015.

**Count I -- Breach of Contract**

80.     Plaintiff incorporates Paragraphs 1 through 79 as though fully stated here.

81.     The Conveyance requires Quantum to make monthly payments to the Trust attributable to the Trust's Overriding Royalty Interests. (Ex. A, p. 12, Article VIII(a).)

82.     Quantum has breached its obligations under the Conveyance by failing to pay to the Trust its Overriding Royalty Interest payments relating to the Jay Field.

83.     Quantum has breached its obligations under the Conveyance by manipulating the Special Cost Escrow balance to avoid paying to the Trust its Overriding Royalty Interest payments relating to the Jay Field.

15

84.     Quantum has breached its obligations under the Conveyance by manipulating the Excess Production Cost balance to avoid paying to the Trust its Overriding Royalty Interest payments relating to the Jay Field.

85.     Quantum has breached its obligations under the Conveyance by failing and refusing to provide the Trust with complete information relating to the Jay Field, including information relating to Quantum's actions as both the Working Interest Owner and Operator of the field.

86.     The Trust has fully performed all of its obligations under the Conveyance.

87.     As a direct and proximate result of Quantum's breaches of its obligations under the Conveyance, the Trust has suffered and continues to suffer damages.

WHEREFORE, Plaintiff Trust respectfully requests that the Court grant the following relief: (a) enter a Judgment against Defendants and in favor of the Trust in the amount of at least $18 million, plus interest, attorney fees and costs; (b) enter an Order requiring Defendants to immediately begin making monthly Overriding Royalty Interest payments to the Trust on a monthly basis, as required  by Article VIII(a) of the Conveyance; (c) enter an Order requiring Defendants to place all escrowed funds associated with the Trust's interest in the Jay Field in an escrow account controlled by an independent escrow agent; (d) enter an Order requiring Defendants to immediately begin providing monthly financial reports to the Trustee as required by the Conveyance; (e) enter an Order requiring Defendants to immediately produce all information and documents requested by the Trust's auditors relating to the Jay Field; (f) enter a Judgment for the amount of damages suffered by the Trust and its Unit holders in the event the SEC revokes the Trust's registration as a result of Quantum's actions; and (g) enter an Order

16

enjoining the sale of QR Energy to BreitBurn until such time as Quantum has complied with its obligations to pay royalties to the Trust and provide complete financial information to the Trust.

## Count II – Statutory Conversion

88.    Plaintiff incorporates Paragraphs 1 through 87 as though fully stated here.

89.    The Trust owns and is entitled to possession of Overriding Royalty Interest payments relating to the Jay Field.

90.    Quantum has unlawfully and without authorization assumed and exercised control over the Trust's Overriding Royalty Interest payments to the exclusion of and inconsistent with the Trust's rights to the payments.

91.    The Trust has demanded that Quantum deliver the Overriding Royalty Interest payments to the Trust.

92.    Quantum has refused to deliver the Overriding Royalty Interest payments to the Trust.

93.    As a direct and proximate result of Quantum's conversion of the Trust's Overriding Royalty Interest payments, the Trust has suffered and continues to suffer damages.

94.    The foregoing acts by Quantum constitute statutory conversion under MCL § 600.2919a.

95.    Under MCL § 600.2919a, Quantum is liable to the Trust for "3 times the amount of actual damages sustained, plus costs and reasonable attorney fees."

WHEREFORE, Plaintiff Trust respectfully requests that the Court enter a Judgment against Defendants and in favor of the Trust in the amount of at least $54 million, plus interest, attorney fees and costs.

00928127.DOCX

## Count III -- Fraud

96.     Plaintiff incorporates Paragraphs 1 through 95 as though fully stated here.

97.     Since taking control of the operations of the Jay Field in April 2007, Quantum has made representations to the Trust that (a) the Trust would receive its Overriding Royalty Interest payments as provided under the Conveyance and (b) that Quantum would provide financial information to the Trust, an ongoing basis and upon request, regarding the Jay Field's resources and operations.

98.     On information and belief, Quantum knew as the time it made the representations to the Trust that the representations were untrue.

99.     Evidence of the falsity of Quantum's representations includes the following actions by Quantum: (a) failing to pay the Trust royalties associated with its Overriding Royalty Interest; (b) artificially and fraudulently manipulating the Special Cost Escrow to avoid paying royalties to the Trust; (c) artificially and fraudulently manipulating the Excess Production Cost balance to avoid paying royalties to the Trust; and (d) failing to fully disclose documents and information relating to the operations and financials of the Jay Field.

100.    The Trust has relied upon Quantum's representations by, among other ways, not taking legal action to pursue the collection of its Overriding Royalty Interest Payments.

101.    On information and belief, Quantum intended that the Trust would rely upon the representations when it made them.

102.    As a direct and proximate result of the misrepresentations of Quantum, the Trust has suffered and continues to suffer damages.

WHEREFORE, Plaintiff Trust respectfully requests that the Court grant the following relief: (a) enter a Judgment against Defendants and in favor of the Trust in the amount of at least

00928127.DOCX

18

$18 million, plus interest, attorney fees and costs; (b) enter an Order requiring Defendants to immediately begin making monthly Overriding Royalty Interest payments to the Trust on a monthly basis, as required by Article VIII(a) of the Conveyance; (c) enter an Order requiring Defendants to place all escrowed funds associated with the Trust's interest in the Jay Field in an escrow account controlled by an independent escrow agent; (d) enter an Order requiring Defendants to immediately begin providing monthly financial reports to the Trustee as required by the Conveyance; (e) enter an Order requiring Defendants to immediately produce all information and documents requested by the Trust's auditors relating to the Jay Field; (f) enter a Judgment for the amount of damages suffered by the Trust and its Unit holders in the event the SEC revokes the Trust's registration as a result of Quantum's actions; and (g) enter an Order enjoining the sale of QR Energy to BreitBurn until such time as Quantum has complied with its obligations to pay royalties to the Trust and provide complete financial information to the Trust.

### Count IV – Breach of Fiduciary Duty

103.    Plaintiff incorporates Paragraphs 1 through 102 as though fully stated here.

104.    Quantum has virtually complete control over the Jay Field as the Working Interest Owner and Operator.

105.    The Trust reposed great trust and reliance in Quantum to properly protect the Trust's interest in the Jay Field.

106.    By purchasing the Working Interest and Operating Interest in the Jay Field, Quantum voluntarily accepted the Trust's trust and confidence.

107.    At all relevant times, Quantum owed fiduciary duties to the Trust, including but not limited to: (a) the duty to avoid placing its self interest before or in conflict with that of the

Trust; (b) the duty to act honestly in all dealings with the Trust; (c) the duty to act with the utmost good faith and loyalty toward the Trust; and (d) the duty of disclosure to the Trust.

108.    Quantum has breached these fiduciary duties by among other things: (a) failing to pay the Trust royalties associated with its Overriding Royalty Interest; (b) artificially and fraudulently manipulating the Special Cost Escrow to avoid paying royalties to the Trust; (c) artificially and fraudulently manipulating the Excess Production Cost balance to avoid paying royalties to the Trust; (d) attempting to purchase the Trust's interest in the Jay Field at a deflated price, thereby placing Quantum's self-interest above and in direct conflict with the Trust's interests; (e) failing to act honestly in its dealings with the Trust; (f) failing to act with good faith and loyalty toward the Trust; and (g) failing to fully disclose documents and information relating to the operations and financials of the Jay Field.

109.    As a direct and proximate result of Quantum's actions, the Trust has suffered and continues to suffer damages.

WHEREFORE, Plaintiff Trust respectfully requests that the Court grant the following relief: (a) enter a Judgment against Defendants and in favor of the Trust in the amount of at least $18 million, plus interest, attorney fees and costs; (b) enter an Order requiring Defendants to immediately begin making monthly Overriding Royalty Interest payments to the Trust on a monthly basis, as required  by Article VIII(a) of the Conveyance; (c) enter an Order requiring Defendants to place all escrowed funds associated with the Trust's interest in the Jay Field in an escrow account controlled by an independent escrow agent; (d) enter an Order requiring Defendants to immediately begin providing monthly financial reports to the Trustee as required by the Conveyance; (e) enter an Order requiring Defendants to immediately produce all information and documents requested by the Trust's auditors relating to the Jay Field; (f) enter a

Judgment for the amount of damages suffered by the Trust and its Unit holders in the event the SEC revokes the Trust's registration as a result of Quantum's actions; and (g) enter an Order enjoining the sale of QR Energy to BreitBurn until such time as Quantum has complied with its obligations to pay royalties to the Trust and provide complete financial information to the Trust.

## Count V
### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO")

110.    Plaintiff incorporates Paragraphs 1 through 109 as though fully stated here.

111.    The Trust asserts this claim against Defendants QR Energy and QRE Operating, but not against Defendant QR.

112.    At all times relevant to this Complaint, QR Energy and QRE Operating each constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

113.    QRM is an ongoing "enterprise" within the meaning of 18 U.S.C. § 1961(4), engaging in and affecting interstate commerce.

114.    QR Energy and QRE Operating knowingly conducted and participated, directly and indirectly, in the conduct of QRM.

115.    Defendants knowingly conducted and participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), committing multiple racketeering acts, and for the unlawful purpose of intentionally defrauding the Trust.  These acts include directly committing, or causing to be committed wire fraud in violation of 18 U.S.C. §1343.  Defendants engaged in this pattern of racketeering activity for the unlawful purpose of and with the effect of defrauding the Trust.

116.    Defendants used the interstate wires to further their fraudulent scheme, and their use of interstate wires was reasonably foreseeable by all Defendants.  Defendants used the

00928127.DOCX

interstate wires to create and submit false and misleading financial reports to the Trust and to deceive the Trust into believing it was not receiving royalty payments for legitimate business reasons, when in fact the lack of payments was caused by Defendants' fraudulent activities.

117.    On January 9, 2012, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

118.    On April 2, 2012, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

119.    On April 23, 2012, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

120.    On July 4, 2012, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

121.    On August 20, 2012, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

122.    On November 1, 2012, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

123.    On February 4, 2013, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

124.    On February 7, 2013, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

125.    On March 13, 2013, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

126.    On May 1, 2013, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

00928127.DOCX

127.    On July 15, 2013, Brandon Thompson, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

128.    On October 4, 2013, Jacob Mulkey, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

129.    On February 2, 2014, Jacob Mulkey, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

130.    On May 8, 2014, Jacob Mulkey, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

131.    On June 16, 2014, Jacob Mulkey, then a Quantum employee, sent an email to the Trust that attached a fraudulent financial statement concerning the Jay Field.

132.    On information and belief, Messrs Thompson and Mulkey sent the numerous fraudulent financial statements to the Trust at the direction of certain officers and/or directors of Quantum.

133.    As a result of all of the foregoing activities, including production of the fraudulent financial statements, the Trust was deceived into believing that it was not due any funds from its royalty interests in the Jay Field, when in fact it was.

134.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), the Trust has been injured in its business and property in excess of $18 million.

135.    18 U.S.C. §1962(c) states in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

WHEREFORE, Plaintiff Trust respectfully requests that the Court grant the following relief: (a) enter a Judgment against Defendants and in favor of the Trust in the amount of at least $54 million, plus interest, attorney fees and costs; (b) enter an Order requiring Defendants to immediately begin making monthly Overriding Royalty Interest payments to the Trust on a monthly basis, as required  by Article VIII(a) of the Conveyance; (c) enter an Order requiring Defendants to place all escrowed funds associated with the Trust's interest in the Jay Field in an escrow account controlled by an independent escrow agent; (d) enter an Order requiring Defendants to immediately begin providing monthly financial reports to the Trustee as required by the Conveyance; (e) enter an Order requiring Defendants to immediately produce all information and documents requested by the Trust's auditors relating to the Jay Field; (f) enter a Judgment for the amount of damages suffered by the Trust and its Unit holders in the event the SEC revokes the Trust's registration as a result of Quantum's actions; and (g) enter an Order enjoining the sale of QR Energy to BreitBurn until such time as Quantum has complied with its obligations to pay royalties to the Trust and provide complete financial information to the Trust.

### Count VI – Accounting/Injunctive Relief

136.     Plaintiff incorporates Paragraphs 1 through 135 as though fully stated here.

137.     The Conveyance requires Quantum to provide access to Quantum's books and records relating to the Jay Field to the Trust's auditors "to verify the correctness of the amounts paid and payable to Assignee as the owner of the Overriding Royalty Interests."

138.     Quantum has consistently failed and refused, and continues to fail and refuse, to provide the access to its books and records required by the Conveyance.

WHEREFORE, Plaintiff Trust respectfully requests that the Court grant the following relief: (a) enter an Order requiring Defendants to immediately begin providing monthly financial

24

reports to the Trustee as required by the Conveyance; and (b) enter an Order requiring Defendants to immediately produce all information and documents requested by the Trust's auditors relating to the Jay Field.

### Count VII – Appointment of a Receiver

139.    Plaintiff incorporates Paragraphs 1 through 138 as though fully stated here.

140.    Quantum has consistently abused its positions as the Operator and Working Interest Owner of the Jay Field, to the detriment of the Trust and its Unit holders.

141.    Through its control of the Jay Field, Quantum committed at least the following unlawful acts: (a) failing to pay the Trust royalties associated with its Overriding Royalty Interest; (b) artificially and fraudulently manipulating the Special Cost Escrow to avoid paying royalties to the Trust; (c) artificially and fraudulently manipulating the Excess Production Cost balance to avoid paying royalties to the Trust; (d) attempting to purchase the Trust's interest in the Jay Field at a deflated price, thereby placing Quantum's self-interest above and in direct conflict with the Trust's interests; (e) failing to act honestly in its dealings with the Trust; (f) failing to act with good faith and loyalty toward the Trust; and (g) failing to fully disclose documents and information relating to the operations and financials of the Jay Field.

142.    If Quantum remains in control of the Jay Field, it is likely to continue to engineer methods to make payments to itself without making payments to the Trust and to continue to provide the Trust with timely and accurate information relating to the Jay Field, its finances and its operations.

143.    Absent the appointment of a receiver, Quantum will continue to cause the Trust to suffer damages and will continue to abuse its position as the party in control of the Jay Field.

WHEREFORE, Plaintiff Trust respectfully requests that the Court grant the following

00928127.DOCX

relief: (a) enter an Order appointing a limited receiver over Quantum's interests in the Jay Field

and (b) enter an Order requiring that Quantum bear the entire cost of the appointed receiver.

## Jury Demand

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.

/s/ Ernest J. Essad, Jr.
Ernest J. Essad, Jr.  (P32572)
David E. Plunkett  (P66696)
Attorneys for Plaintiff
380 N. Old Woodward, Suite 300
Birmingham, MI  48009
(248) 642-0333
eje@wwrplaw.com
dep@wwrplaw.com

Dated:  October 3, 2014

00928127.DOCX